IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

LORETTA A. WILLIAMS                                                                    PLAINTIFF

vs.                                    CIVIL NO. 05-4038

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                                          DEFENDANT

## MEMORANDUM OPINION

Loretta Williams ("plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying her applications for disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"), under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were protectively filed on June 25, 2003,[1] alleging an amended onset date of February 21, 2002, due to carpal tunnel syndrome, circulatory problems, heart attacks, back problems, anxiety and depression, and a learning disability. (Tr. 54-56, 72, 78, 89, 168-169). An administrative hearing was held on September 1, 2004. (Tr. 174-207). Plaintiff was present and represented by counsel.

On October 7, 2004, the Administrative Law Judge ("ALJ"), issued a written opinion finding

---

[1]On October 12, 2000, plaintiff filed an application for DIB and SSI with an alleged onset date of July 28, 2000. (Tr. 11). The ALJ issued an unfavorable decision and, on May 31, 2002, the decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review. (Tr. 11). In the current case, the ALJ found that the previous decision was final and binding through February 20, 2002, the date of the ALJ's decision. (Tr. 12). Therefore, the first date which can be considered regarding plaintiff's current application for disability benefits is February 21, 2002, the day after the prior ALJ's decision. (Tr. 12).

that, although severe, plaintiff's impairments did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 20). At this time, plaintiff was thirty-seven years old and possessed a high school education. (Tr. 178-179). The record reveals that she has past relevant work ("PRW"), as a bench assembler. (Tr. 64, 199).

After discrediting plaintiff's subjective allegations, the ALJ concluded that she maintained the residual functional capacity ( "RFC"), to perform a wide range of light work, limited by her ability to only occasionally handle with her right hand. (Tr. 20). With the assistance of a vocational expert, the ALJ then found that plaintiff could still perform work existing in significant numbers in the national economy, to include positions as a flagger, conveyor line bakery worker, and surveillance system monitor. (Tr. 21).

On March 8, 2005, the Appeals Council declined to review this decision. (Tr. 4-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 11, 13).

**Evidence Presented:**

On May 31, 2002, plaintiff sought emergency treatment for a headache. (Tr. 114). Records indicate that she had a history of headaches "on and off." (Tr. 115). Plaintiff was diagnosed with a headache, and prescribed Ultram. (Tr. 115).

On June 12, 2002, plaintiff again reported a headache. (Tr. 119). She also complained of occasional blurred vision, a productive cough, sinus drainage, congestion, and breast pain. (Tr. 120). Plaintiff was diagnosed with bronchitis, sinusitis, and breast pain. (Tr. 119). She was then

2

prescribed Bactrim and instructed to stop smoking, take Aleve for the breast pain, and consider a different bra for more improved support. (Tr. 119, 121-122).

On November 5, 2002, plaintiff complained of bilateral hand and wrist numbness, as well as night-time numbness and tingling. (Tr. 137). An examination revealed no thenar atrophy, although she did have mildly decreased sensation throughout the medial nerve distribution with a positive Tinel's sign. X-rays showed no significant bony abnormalities. Accordingly, Dr. John Young diagnosed her with probable carpal tunnel syndrome. He prescribed a Medrol Dosepak and night splints. In addition, Dr. Young ordered nerve conduction studies. (Tr. 137).

On December 3, 2002, Dr. Young completed a general medical assessment. (Tr. 107-108). He found that plaintiff's swollen hands and arms were a permanent and disabling condition that was characterized by periods of improvement followed by periods of relapse. (Tr. 107). However, Dr. Young indicated that plaintiff's primary disabling condition could be "removed" by treatment. A physical examination revealed bilateral numbness and tingling in the hands. (Tr. 108). As a result, Dr. Young noted that plaintiff's ability to lift, push, and pull with her hands was limited. (Tr. 107). Due to difficulty using her hands, he also found plaintiff to be limited regarding her ability to care for her personal hygiene, tolerate work, and perform work skills. He concluded that her prognosis was poor. However, Dr. Young also indicated that plaintiff would be undergoing carpal tunnel release surgery on both hands within the next eight to ten weeks. (Tr. 107).

On January 30, 2003, nerve conduction studies showed bilateral mild carpal tunnel syndrome with median entrapment, greater on the right than the left. (Tr. 123). Further, it revealed normal right ulnar nerve conduction without entrapment or peripheral neuropathy. (Tr. 123).

3

On February 6, 2003, Dr. Young noted that plaintiff had recently undergone nerve conduction studies showing mild right carpal tunnel syndrome. (Tr. 135). He reviewed the treatment options with plaintiff, including surgery. Because plaintiff had already tried splinting, anti-inflammatories, and a Medrol dose pack to no avail, she opted for surgical intervention. (Tr. 135).

On March 20, 2003, plaintiff complained of swelling in her lower extremities, carpal tunnel symptoms, and chronic headaches. (Tr. 125). Following an examination, Dr. George Covert diagnosed her with hypertension, carpal tunnel syndrome, chronic headaches, and gastroesophageal reflux disorder. (Tr. 125).

On May 22, 2003, plaintiff was again seen by Dr. Young and scheduled for surgery. (Tr. 136). On June 9, 2003, she underwent carpal tunnel release on the right hand. (Tr. 134). Records indicate that plaintiff tolerated the procedure well with no complications. (Tr. 134).

On June 17, 2003, plaintiff was reportedly doing well. (Tr. 133). She complained of some numbness and tingling in her median digits, but had a good range of motion with no evidence of injury to the motor branch. On examination, the wound was clean and dry with only slight erythema. Accordingly, Dr. Young advised her to continue using her carpal tunnel splint for the next two weeks. He also placed her on Keflex to prevent infection. (Tr. 133).

On July 8, 2003, plaintiff continued to complain of numbness and tingling in the median three digits. (Tr. 133). However, she had good motor function in the hand, and her wound remained clean, closed, and dry. Therefore, Dr. Young prescribed physical therapy to include strength and range of motion exercises, as well as wound care. (Tr. 132).

On July 22, 2003, plaintiff's occupational therapist called Dr. Young to report blisters around

AO72A
(Rev. 8/82)

plaintiff's incision site. (Tr. 133). The therapist stated that she had administered whirlpool therapy and that plaintiff's condition had improved. However, plaintiff continued to complain of deep soreness. Dr. Young refused to prescribe medication, stating that he needed to examine plaintiff. However, when she presented on July 24, 2003, she was doing fairly well. (Tr. 131). An examination revealed that the wound was clean, closed, and dry. Plaintiff had good motor function in the median three digits, in spite of her reports of continued pain. As such, Dr. Young recommended an MRI of her cervical spine to rule out any type of herniated disc in her neck. (Tr. 131).

On October 16, 2003, Dr. Young indicated that plaintiff could perform no work whatsoever until she had her follow-up appointment with her neurologist. (Tr. 128).

On November 17, 2003, plaintiff underwent a general physical examination. (Tr. 141-147). She complained of bilateral hand pain and tingling, in spite of having undergone carpal tunnel release. (Tr. 141). Plaintiff stated that she experienced shooting pain in her hands that radiated up her arms and into her back. The pain also reportedly radiated down into her legs and feet. Her medications were said to include Lasix, Potassium, and Hydrocodone. (Tr. 141).

On examination, the doctor noted that plaintiff was five foot two and one-half inches tall and weighed 237 pounds. (Tr. 143). Her blood pressure was elevated at 138/84. He noted a decreased range of cervical rotation and lumbar flexion. (Tr. 144). Further, testing revealed limitations regarding dorsiflexion in the left wrist and ankles. The doctor also noted mildly limited movement in the right wrist. (Tr. 145). No muscle atrophy, weakness, joint abnormalities, or gait/coordination problems were noted. There was also no evidence of edema. (Tr. 146). Additionally, no evidence

5

of psychosis or serious mood disorder was noted. Accordingly, the doctor concluded that plaintiff's symptoms were unusual and not consistent with any major physical or neurological syndrome. (Tr. 147). He did, however, state that she might have a component of fibromyalgia syndrome that he would treat with non-steroidal anti-inflammatories and anti-depressants. As such, he concluded that she had no physical limitations. (Tr. 147).

On May 18, 2004, plaintiff complained of a cold, swelling in her lower extremities, and right hip pain. (Tr. 162). She indicated that her right hip hurt when she walked and when trying to move it in her sleep. The doctor noted that plaintiff was obese, but found her to be in no acute distress. He did, however, note some nasal congestion with post nasal drainage, tenderness in the right hip, and pedal edema. After diagnosing her with hypertension, congestive heart failure, an upper respiratory infection, and osteoarthritis, she was prescribed Accupril and another indecipherable medication. (Tr. 162).

On June 15, 2004, plaintiff sought treatment for hoarseness, sinus drainage, allergies, bilateral lower extremity edema, upper abdominal pain, and an inability to digest meats. (Tr. 161). An examination revealed redness in the throat, a cyst on the tonsil, pedal edema, and elevated blood pressure. After being diagnosed with hypertension, edema, fatigue due to the Lasix, dyspepsia, and an upper respiratory infection, plaintiff was prescribed Prilosec and Zithromax. The doctor also increased her dosage of Accupril and Lasix. (Tr. 161).

On June 17, 2004, plaintiff was treated for a headache, a rash on the back of her neck, and hoarseness. (Tr. 160). She was directed to continue her current medications. (Tr. 160). On June 21, 2004, plaintiff returned for a follow-up. (Tr. 160). She continued to have a rash on the back of

her neck and arms, was hoarse, and was tired and sluggish. Her eyes were also watery and irritated. Records indicate that plaintiff had taken five days of antibiotics. Accordingly, she was diagnosed with allergic rhinitis and prescribed Zyrtec. (Tr. 160).

On July 1, 2004, an upper gastrointestinal series, performed due to plaintiff's abdominal pain, was negative. (Tr. 157).

On July 20, 2004, plaintiff indicated that she could not afford Zyrtec or her blood pressure medication. (Tr. 154). At this time, she had a generalized rash and was hoarse. The nurse practitioner gave her samples of Nexium, and advised her to get Aciphex or Prilosec over-the-counter. (Tr. 154).

On August 18, 2004, plaintiff complained of "knots breaking out all over her body." (Tr. 153). The Greater Texarkana Peoples' Clinic records indicate that she was taking Lotensin for her blood pressure. Plaintiff also reported experiencing headaches. As she could not afford Zyrtec, the doctor prescribed Loratidine. Plaintiff was also prescribed Zithromax for some boils on her left thigh. Her other medications were said to include Ibuprofen, Lasix, and Potassium. (Tr. 153).

**Applicable Law:**

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the

Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months. *Titus v. Sullivan*, 4 F.3d 590, 594 (8th Cir. 1993).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy

given her age, education, and experience. *See* 20 C.F.R. §§ 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. §§ 404.1520, 416.920 (2003).

**Discussion:**

We first address the ALJ's assessment of plaintiff's subjective complaints. The ALJ was required to consider all the evidence relating to plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) plaintiff's daily activities; (2) the duration, frequency, and intensity of her pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of her medication; and (5) functional restrictions. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit recently observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide." *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003).

Plaintiff has alleged a variety of disabling physical impairments, namely carpal tunnel syndrome, circulatory problems, heart attacks, back problems, anxiety and depression, and a learning disability. (Tr. 54-56, 72, 78, 89, 168-169). After reviewing the medical evidence and testimony of record, however, we conclude that the ALJ's determination that plaintiff's subjective complaints are not totally credible is supported by substantial evidence. Neither plaintiff's testimony nor the objective medical evidence supports plaintiff's allegations.

9

First, we note that plaintiff has been diagnosed with bilateral carpal tunnel syndrome. However, as the records show, she underwent right carpal tunnel release surgery in June 2003. (Tr. 134). There are no records to show that plaintiff ever underwent surgery on her left hand. Following surgery, plaintiff did complain of continued pain in her right hand, but physical examinations revealed good motor function with minimal limitations. (Tr. 131, 147). In fact, a general physical examination showed only limitations regarding dorsiflexion in the left wrist and mildly limited movement in the right wrist. (Tr. 145). There were no limitations noted in plaintiff's ability to perform fine and gross manipulation. (Tr. 145). *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider); *Matthews v. Bowen,* 879 F.2d 422, 425 (8th Cir. 1989) (medical reports showing only minimal back problem allowed ALJ to discount claimant's subjective complaints of disabling back pain). Further, following this examination in November 2003, plaintiff did not seek further medical attention for this condition. *See Edwards*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment); *See Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (per curiam)(finding failure to seek treatment inconsistent with subjective complaints). Records do indicate that plaintiff sought treatment from The Greater Texarkana Peoples' Clinic after this date, but only show that she was treated for allergic rhinitis, gastroesophageal reflux disorder, swelling in her lower extremities, boils on her thigh, and headaches. (Tr. 153-162).

As for her allegations concerning circulatory problems, heart attacks, back problems, anxiety and depression, and a learning disability, we can find no evidence to support these contentions.

AO72A
(Rev. 8/82)

While the record does reveal that plaintiff was diagnosed with high blood pressure, it also reveals that she was prescribed medication to treat this impairment. *See Gowel v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding fact that physician prescribed conservative treatment weighed against plaintiff's subjective complaints); *See Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995) (holding that a condition that can be controlled or remedied by treatment cannot serve as a basis for a finding of disability). Further, records indicate that she failed to take her medication as prescribed. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) (holding that claimant's failure to follow prescribed course of treatment weighed against credibility when assessing subjective complaints of pain).

Likewise, we note that plaintiff was diagnosed with gastroesophageal reflux disorder and prescribed medication to treat this impairment. (Tr. 153-162). *See Roth*, 45 F.3d at 282. However, as with her blood pressure medication, plaintiff did not have her prescriptions filled as directed. *See Dunahoo*, 241 F.3d at 1038. Further, there is no objective indication in the record of any limitations resulting from this impairment. On July 1, 2004, an upper gastrointestinal series was negative. (Tr. 157). Therefore, we cannot say that plaintiff's high blood pressure or gastroesophageal reflux disorder were disabling impairments.

We also note that plaintiff was diagnosed with congestive heart failure on May 18, 2004, but this is the only indication concerning this alleged impairment. (Tr. 162). It appears that this diagnosis was made simply because plaintiff complained of swelling in her lower extremities, an impairment treated via Lasix. (Tr. 153-162). *See Gowel*, 242 F.3d at 796. There is, however, no objective evidence to support a diagnosis of congestive heart failure. *See Forte*, 377 F.3d at 895.

11

It is also significant to note that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).

There is also evidence to show that plaintiff was repeatedly diagnosed with an upper respiratory infection. (Tr. 153-162). However, we note that these diagnoses were made on consecutive office visits and were treated via antibiotics and allergy medication. *See Roth*, 45 F.3d at 282. Further, there is no evidence of permanent limitations caused by this impairment.

The record also reveals that plaintiff was diagnosed with osteoarthritis, due to pain in her right hip. However, this, too, was only diagnosed on one occasion during the relevant time period. (Tr. 162). *See Trenary*, 898 F.2d at 1364. While the record does indicate that plaintiff was somewhat limited with regard to cervical rotation and lumbar flexion, medical records do not indicate any medically ordered restrictions regarding these limitations. (Tr. 144). *See Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that a lack of medically ordered restrictions weighs against credibility); *Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir. 1993) (same). In fact, the consultative examiner documenting these limitations found that plaintiff was not suffering from any major physical or neurological syndrome. (Tr. 147). While he suggested fibromyalgia as a possible cause for her symptoms, he also noted that he would treat her symptoms via non-steroidal anti-inflammatories and anti-depressants. (Tr. 147). *See Gowel*, 242 F.3d at 796. As such, we cannot say that this impairment was disabling. *See Forte*, 377 F.3d at 895.

Although plaintiff now contends that the ALJ failed to consider her obesity in combination with her other impairments, we note plaintiff did not allege in her application or at the hearing that

12

her weight was disabling. *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995). In fact, the record indicated that plaintiff had a sixteen year work history in spite of her weight, and that she felt she could return to work but for her hands. (Tr. 64, 181). Further, there is only one instance in the record in which plaintiff was labeled obese. On May 18, 2004, a physician from the Greater Texarkana Peoples' Clinic noted that plaintiff weighed 247 pounds; that she was obese; and, she was in no acute distress. (Tr. 162). On September 1, 2004, at the administrative hearing, plaintiff testified that she weighed 235 pounds the last time she checked, and that she had lost weight since then. (Tr. 178). Accordingly, we can find no evidence in the record to show that plaintiff's obesity caused her any functional limitations whatsoever. *Box*, 52 F.3d at 171. Therefore, the ALJ properly determined that plaintiff's obesity was not a severe impairment, and plaintiff's argument is without merit.

As for her alleged mental impairments, we can find no evidence to show that plaintiff was ever diagnosed with a mental impairment. At the time of her general physical examination in November 2003, there was no evidence of psychosis or serious mood disorder noted. (Tr. 146). Further, the record contains no evidence to show that plaintiff ever complained of, or was diagnosed with anxiety, depression, or a learning disorder. *See Forte*, 377 F.3d at 895. Accordingly, we cannot say that these alleged impairments were severe.

Plaintiff contends that her failure to comply with her blood pressure and gastroesophageal reflux disorder medications was excused by her financial situation. This assertion, however, is belied by the fact that the record contains no evidence to show that plaintiff ever sought financial assistance in obtaining her medication. *See Murphy v. Sullivan*, 953 F.3d 383, 386-87 (8th Cir.

AO72A
(Rev. 8/82)

1992) (holding that lack of evidence that plaintiff sought low-cost medical treatment from her doctor, clinics, or hospitals does not support plaintiff's contention of financial hardship). The evidence makes clear that plaintiff was aware of the existence of such services, as she was being treated by the Greater Texarkana Peoples' Clinic, a charitable clinic. (Tr. 153-162). Accordingly, we do not find her non-compliance to be excused by her financial state.

Plaintiff's own reports concerning her activities of daily living also contradict her claim of disability. On June 27, 2003, plaintiff completed a disability supplemental interview outline. (Tr. 59-60). She reported an ability to do the laundry, take out the trash, shop for groceries and clothing, go to the bank, prepare meals, pay bills, count change, walk for exercise or errands, use public transportation, attend church, watch TV, listen to the radio, and read. (Tr. 60). *See Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996) (ability to care for one child, occasionally drive, and sometimes go to the store); *Nguyen v. Chater*, 75 F.3d 429, 430-31 (8th Cir. 1996) (ability to visit neighbors, cook, do laundry, and attend church); *Novotny v. Chater*, 72 F.3d at 671 (ability to carry out garbage, carry grocery bags, and drive); *Johnston v. Shalala*, 42 F.3d 448, 451 (8th Cir. 1994) (claimant's ability to read, watch television, and drive indicated her pain did not interfere with her ability to concentrate); *Woolf v. Shalala*, 3 F.3d 1210, 1213-1214 (8th Cir. 1993) (ability to live alone, drive, grocery shop, and perform housework with some help from a neighbor).

Therefore, although it is clear that plaintiff suffers with some degree of pain, she has not established that she is unable to engage in any gainful activity. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d at 1213 (holding that, although plaintiff did have

14

degenerative disease of the lumbar spine, the evidence did not support a finding of disabled). Neither the medical evidence nor the reports concerning her daily activities support plaintiff's contention of total disability. Accordingly, we conclude that substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were not totally credible.

Plaintiff also contends that the ALJ erred in finding that she maintained the RFC to perform a significant range of light work. It is well settled that the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000). The United States Court of Appeals for the Eighth Circuit has also stated that a "claimant's residual functional capacity is a medical question," *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000), and thus, "some medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the plaintiff's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Nevland v. Apfel*, 2 04 F.3d 853, 858 (8th Cir. 2000). Therefore, in evaluating the plaintiff's RFC, *see* 20 C.F.R. § 404.1545(c), while not limited to considering medical evidence, an ALJ is required to consider at least some supporting evidence from a professional. *Cf. Nevland v. Apfel*, 204 F.3d at 858; *Ford v. Secretary of Health and Human Servs.*, 662 F. Supp. 954, 955, 956 (W.D. Ark.1987) (RFC was "medical question,"and medical evidence was required to establish how claimant's heart attacks affected his RFC).

In the present case, the ALJ considered the medical assessment of a non-examining agency medical consultant, plaintiff's subjective complaints, and her medical records. On August 18, 2003, Dr. Jerry Thomas, a non-examining, consultative physician completed a physical RFC assessment.

15

(Tr. 148). After reviewing plaintiff's medical records and examining her, he concluded that her physical impairment was non-severe. (Tr. 148).

While we do note Dr. Young's October 16, 2003 notation that plaintiff could perform no work whatsoever until she had her follow-up appointment with her neurologist, we can find no evidence in the record to show that plaintiff ever did so. (Tr. 128). Further, Dr. Young does not point to any medical evidence to explain why plaintiff was unable to work. In fact, the medical records from Dr. Young's office do not even support his assertion. Although Dr. Young advised plaintiff to undergo an MRI of her cervical spine to rule out the possibility of a herniated disk in her neck, progress notes regarding plaintiff's physical examinations reveal that she had good motor functioning in the medial three digits in her right hand, in spite of alleged pain. (Tr. 131). There is no evidence to show that plaintiff ever underwent the suggested MRI. In fact, following a general physical examination in November 2003, plaintiff did not seek further treatment for her carpal tunnel syndrome. (Tr. 141-162). *See Forte*, 377 F.3d at 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider); *Matthews v. Bowen,* 879 F.2d 422, 425 (8th Cir. 1989) (medical reports showing only minimal back problem allowed ALJ to discount claimant's subjective complaints of disabling back pain). As such, we cannot say that the ALJ erred by failing to afford Dr. Young's notations substantial weight.

It is also significant to note that, although plaintiff was diagnosed with mild bilateral carpal tunnel syndrome, she had not been treated for symptoms in her left hand since before June 2003, when she underwent carpal tunnel release surgery on her right hand. In fact, aside for her general physical exam, plaintiff never reported any limitations with regard to her left hand. (Tr. 141).

Again, we note that a mere diagnosis is not sufficient to prove disability, absent some evidence to establish a functional loss resulting from that diagnosis. *See Trenary*, 898 F.2d at 1364. Therefore, we find substantial evidence to support the ALJ's conclusion that plaintiff has the residual functional capacity to perform a significant range of light work, limited only by her ability to occasionally handle with her right hand.

We also find that substantial evidence supports the ALJ's finding that plaintiff can perform the positions of flagger, conveyor line bakery worker, and surveillance system monitor. A VE testified that a person of plaintiff's age and experience, who could perform unskilled, light work that did not require more than occasional handling and gripping with the right hand, could perform the positions of flagger, conveyor line bakery worker, and surveillance system monitor. (Tr. 201-202). After reviewing the evidence of record, we find that the hypothetical question posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997); *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996). Accordingly, we find substantial evidence to support the ALJ's determination that plaintiff could perform these positions.

**Conclusion:**

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

AO72A
(Rev. 8/82)

ENTERED this 24th day of July 2006.

    /s/ Bobby E. Shepherd
    HONORABLE BOBBY E. SHEPHERD
    UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)